**Not Scheduled for Oral Argument**

**SEPTEMBER TERM, 2014**

APPEAL NOS. **14-7069 and 14-7080**
_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

## BETTY FLYTHE

**Appellant/Cross-Appellee,**

**vs.**

## DISTRICT OF COLUMBIA, et al.

**Appellees/Cross-Appellant,**

_____

# APPELLANT'S BRIEF
_____

**ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**GREGORY L. LATTIMER, ESQ.**
**LAW OFFICES OF GREGORY L.**
**LATTIMER, PLLC**
**1200 G Street, N.W., Suite 800**
**Washington, D.C.  20005**
**Telephone No.: (202) 638-0095**

**ERNEST W. MCINTOSH**
**NEWMAN & MCINTOSH**
**1331 H Street, N.W.**
**Suite 902**
**Washington, D.C.  20005**
**(202) 638-1331**

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULING AND RELATED CASES

**Parties And Amici**

  Betty Flythe - Appellant
  District of Columbia - Appellee
  Travis Eagan - Appellee
  Angel R. Vazquez - Appellee

  All parties appeared before the District Court.  There was no Amici before the District Court or this Court.

**Rulings Under Review:**

  The District Court's Orders (Docket Nos. 48, 49, 61, 71, 72, 86, 99, 122), Minute Order dated March 31, 2014, all evidentiary rulings, and rulings on jury instructions and verdict form.

**Related Cases:**

  This case was not previously before this court.  It has been consolidated with Defendants' appeal (Case No. 14-7080).

## <u>TABLE OF CONTENTS</u>

I. STATEMENT OF ISSUES PRESENTED FOR REVIEW......................................1

II. JURISDICTIONAL STATEMENT ..................................................................2

III. STATEMENT OF THE CASE ........................................................................2

IV. STATEMENT OF RELEVANT FACTS..........................................................4

V. SUMMARY OF ARGUMENT.........................................................................10

VI. ARGUMENT....................................................................................................11

    **A.**    **The Trial Court Erred As A Matter Of Law When It Granted Summary Judgment To The District Of Columbia With Respect To Negligent Supervision** ......................11

    **B.**    **The Trial Court Ignored Facts That Were Unfavorable To Defendant Eagan In Granting Summary Judgment On Plaintiff's § 1983 Claim** ..........................18

    **C.**    **The Trial Court Denied The Plaintiff A Fair Trial When It Refused To Allow The Jury To Hear And Render A Verdict Based On The Evidence And Facts Available** ................28

        **1.**    **Bronson Levin, Ph.D** ...............................................29

        **2.**    **Myron Weiner, Ph.D** ...............................................34

        **3.**    **Timothy Longo** .......................................................37

        **4.**    **The Exclusion Of All Other Evidence Challenging the Credibility of Mr. Eagan** ...........................38

    **D.**    **The Trial Court Committed Reversible Error When It Unfairly Precluded Meaningful**

      Cross-Examination Of Travis Eagan.............................................39

  E.    The Trial Court Had No Basis Whatsoever To
       Grant Summary Judgment To Defendant Eagan
       With Regard To Plaintiff's Claim For Assault And Battery........44

  F.    The Trial Court Improperly Instructed The Jury With
       Respect To Plaintiff's Claims Under 42 U.S.C. § 1983..................46

  G.    The Plaintiff Is Entitled To A New Trial On The
       Issue Of Damages With Respect To Defendant Vazquez .............48

  H.    The Trial Court's Ruling Granting A Set-Off To
       The District Of Columbia In The Absence Of Any
       Evidence Of Any Kind Indicating That Any Portion
       Of The Damages Award Represented Compensation
       For Care And Treatment That It Provided Or
       Paid For Was Erroneous As A Matter Of Law ............................49

VII. CONCLUSION..................................................................................53

## TABLE OF AUTHORITIES

**Case**:

*Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999) ...............................................21

*Alford v. United States*, 282 U.S. 687 (1931) .......................................................40-41

*\*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...............................................25, 28

*Brown v. Argenbright Sec. Inc.*, 782 A. 2d 752, 760 n.10 (D.C. 2001)..................12

*Daskalea v. D.C.*, 227 F.3d 433, 445 (D.C. Cir. 2000)...........................................14

*\*District of Columbia v. Jackson*, 451 A.2d 867, 873 (D.C. 1982) ....................52, 53

*District of Columbia v. Morris*, 367 A.2d 571, 573 (D.C. 1976)............................52

*District of Columbia v. Peters,* 527 A.2d 1269, 1274 (D.C. 1987)........................45

*District of Columbia v. United Jewish Appeal Fed'n*, 672 A.2d 1075,
1080-81 (D.C. 1996) ...............................................................................................51,52

*Du Beau v. Smither and Mayton, Inc.*, 203 F.2d 395 (D.C. Cir. 1953) .................40

*Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)...............................................21

*Etheredge v. District of Columbia*, 635 A.2d 908,916 (D.C.1993) .......................44

*\*Exxon, U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 841-42 (1996)......................................17

*Farouki v. Petra International Banking Corp.*, 705 F.3d 515,
517 (D.C. Cir. 2013) ...............................................................................................15

*Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. App. 1985).............................12

*Haymon v. Wilkerson*, 535 A.2d 880, 885 (D.C. 1987) .....................................48-49

*Henderson v. George Washington University*, 449 F.3d 127, 133 (D.C. Cir. 2006) ............................................................34

*Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013)..............47

*Lester v. Dunn*, 475 F.2d 983, 986 (D.C. Cir. 1973)...............................................49

*Lytle v. Bexar County Tex.*, 560 F. 3d 404, 413 (5th Cir. 2009) ...............................21

*Majeska v. D.C.*, 812 A.2d 948, 950 (D.C. 2002) ....................................................17

*Morgan v. District of Columbia*, 449 A.2d 1102, 1108 & n.3 (D.C. 1982), *rev'd on other grounds*, 468 A.2d 1306 (1983)(en banc) .................14

*Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988)..............................................21

*Smith v. District of Columbia*, 413 F.3d 86, 102-03 (D.C. Cir. 2005)....................17

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985).........................................................22

*United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014).  2014)........3, 47, 48

*United States v. Kearney*, 420 F.2d 170 (1969) ......................................................41

*U.S. v. Robinson*, 583 F.3d 1265, 1272 (10th Cir.2009) .........................................36

*United States v. Sampol*, 636 F.2d 621(D.C. Cir. 1980) .........................................37

*United States v. Watson*, 409 F.3d 458, 463 (D.C. Cir. 2005) ...............................34

*Washington Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D.C. 1992) ......................................................................17

*Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ........................................22

**U.S. Code**

28 U.S.C. § 1292 .......................................................................................2

-iv-

28 U.S.C. § 1331....................................................................................2

42 U.S.C. § 1983..................................................................................48

**D.C. Code**

D.C. Code §4-602 ................................................................................50

D.C. Code §4-603 ................................................................................51

D.C. Code §4-606 ................................................................................50

D.C. Code §4-607 ............................................................................51,52

D.C. Code § 4-716 (1988). ..................................................................45

**Federal Rules of Civil Procedures**

Federal Rules of Civil Procedure Rule 51............................................46

Federal Rules of Civil Procedure Rule 56(f) .......................................15

**Federal Rules of Evidence**

F.R.E. 403 ............................................................................................33

F.R.E.611................................................................................................43

F.R.E. 611(b) .......................................................................................40

**D.C. Superior Court Civil Rules**

Super. Ct. Civ. R. 13 (a)......................................................................52

**Miscellaneous:**

§213 of the Restatement of Agency ....................................................13

8 J. Wigmore on Evidence, § 2276(7) at 474 (McNaughton rev. 1961). ...............40

Standardized Civil Jury Instructions for the District of Columbia §5.12.................14

Standardized Civil Jury Instructions for the District of Columbia §5.13................14

\*  Authority principally relied upon is marked with an asterisk.

# I.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the trial court err when it granted summary judgment in favor of the District of Columbia with respect to plaintiff's claim for the negligent supervision of a police officer who was admittedly unfit for duty when he shot plaintiff's decedent to death while on duty?

2. Did the trial court err when it granted summary judgment in favor of Travis Eagan even though several eyewitnesses indicated that plaintiff's decedent was unarmed and non-threatening when Mr. Eagan shot him to death?

3. Did the trial court err when it excluded the testimony of plaintiff's expert psychologist who was prepared to testify about extraneous factors that would have adversely affected Mr. Eagan's mental status in general and his ability to observe, assess, and remember?

4.  Did the trial court err when it excluded the testimony of plaintiff's toxicologist who was prepared to testify as to the effects of Mr. Eagan's drug use, both legal and illegal on his ability to observe, assess, remember and recount events?

5.  Did the trial court err when it limited the testimony of plaintiff's police practices expert regarding the foreseeability of the shooting death of plaintiff's decedent?

6.Did the trial court err when it prevented the plaintiff from introducing evidence of Mr. Eagan's unfitness for duty, drug use, physical and mental health

issues, and his termination for illegal drug use?

7.  Did the trial court err when it refused to allow the plaintiff to cross-examine Mr. Eagan about matters that prevented him from performing his duties as a police officer on a regular basis and which would have affected his ability to observe, assess, remember and recount events?

8.Did the trial court err when it refused to give standard jury instructions requested by the plaintiff in favor of instructions that were a confusing hodge podge collection of case excerpts?

9.  Did the trial court err when it granted a set-off to the District of Columbia in the absence of any indication that any portion of the jury award was attributable to medical expenses?

## II. <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction pursuant to 28 U.S.C. § 1331.  This Court would therefore have jurisdiction under 28 U.S.C. § 1292 as the appeal in this matter is from a final order of the district court.

## III.   <u>STATEMENT OF THE CASE</u>

Appellant Betty S. Flythe, brought suit personally and in her capacity as the Personal Representative of the Estate of Tremayne G. Flythe's, as a result of the shooting death of her son by members of the District of Columbia Police Department.

Ms. Flythe brought a wrongful death and survival suit, alleging that defendants District of Columbia ("District"), Police Chief Cathy Lanier ("Lanier"), Officer Angel Vazquez ("Vazquez")  and Officer Travis Eagan ("Eagan") deprived Mr. Flythe of his civil rights when they subjected him to excessive force, were negligent in the supervision of Eagan when the District allowed Eagan to return to full duty after being removed from duty for being unfit, to carry a firearm and to exercise police powers despite the fact that he was unfit to do so, and were liable for assault and battery as a result of the unjustified fatal shooting of Mr. Flythe.[1]

Defendant Eagan and defendants District,  Lanier and Vazquez filed separate summary judgment motions.  JA 180-327 and 328-471.  The trial court granted defendant Eagan's motion for summary judgment and dismissed all claims against him.  The trial court granted in part and denied in part the summary judgment motion of defendants District, Lanier and Vazquez.  JA 797-838.  The court dismissed all counts against Lanier  dismissing her from the lawsuit and dismissed the excessive force claim against Vazquez,

Following this Court's decision in *U.S. v. Brodie*, No. 11-3029, (February 18, 2014), and after considering the parties' supplemental filing addressing the affect of

---

[1]/  Plaintiff filed an amended complaint, which encompassed these allegations on September 20, 2011. Joint Appendix ("JA") 25-31.

this ruling, the district court amended its earlier ruling granting summary judgment in favor of Vazquez on plaintiff's federal excessive force claim against him and reinstated that claim.  JA 1219-1227.

A trial was convened with respect to plaintiff's remaining claims on March 31,2014 and the jury returned a verdict for the plaintiff and against the District in the amount of $187,300 on April 8, 2014.  JA 2398-2400.[2]   Defendant District filed a motion to set off the amount of an alleged medical "lien," JA  2401-2404, which the court granted, JA 2414-2418.  Thus, judgment in the amount of $119,253.24 was entered on April 30, 2014.  JA 2419.  Plaintiff filed a notice of appeal on that same day, JA 2420-2421 and defendant District filed a cross appeal on May 30, 2014. JA 2422-2423.

## IV.  Statement Of Relevant Facts

Tremayne Flythe was shot and killed by Travis C. Eagan, a former Metropolitan Police Officer, on December 26, 2009.  However, long before the shooting incident, Mr. Eagan was a troubled police officer with a multitude of medical issues and personal issues who had been referred to the Employee Assistance

---

[2]/ While the jury found that Officer Vazquez assaulted Mr. Flythe, and that the District was liable for the assault and battery by both Officer Vazquez and Officer Eagan, the jury awarded damages against only the District.   JA 2398-2400. The jury did not award damages against Officer Vazquez.

Program by his supervisor. JA 588-590. In October, 2009, Mr. Eagan's supervisor began to have more serious concerns about him. Between October 2, and October 15, 2009, she noticed that his situation had deteriorated to the point where his fitness for duty was in question, and she wrote a memorandum to that effect. JA 590-591. At that time she had concluded that he was not "capable of performing his duties." JA 590-600. Because of her grave concerns about Mr. Eagan's fitness for duty, she revoked his police powers, and relieved him of his weapon pending an appropriate fitness for duty evaluation. JA 601-602.

The actual fitness for duty examination did not take place until after the shooting incident occurred according to Lt. Felicia Lucas-Rahman, the then deputy director of the MPD Medical Services Branch. JA 604-605, 607-608. Lt. Timberlake indicates, when discussing Mr. Eagan, that "He should have remained revoked until they sent him for his fitness-for-duty-physical." JA 603. Drug testing is done with the medical appointment, which is the first appointment. JA 606.

Inexplicably, Mr. Eagan had his police powers restored by a civilian employee of the MPD, even though an "official" of the department is the only person who can revoke or restore powers, JA 611-613. Somehow Mr. Eagan had his police powers and weapon returned on October 29, 2009, JA 614, even though it was known that he was required to undergo a fitness for duty examination prior to such action

-5-

occurring, and even though Mr. Eagan himself acknowledges that he did not have such an examination until December, 2009. JA 527. Thus, it was undisputed that defendant District of Columbia had determined that Mr. Eagan was not fit for duty on December 26, 2009.

Notwithstanding the above, Mr. Eagan was working as a police officer on December 26, 2009. He and defendant Vasquez responded to a service call on Georgia Avenue, involving destruction of property. The property owner, Babir Hundal, got into a vehicle with Mr. Eagan, and he and Eagan and Vasquez went looking about the area for the person who had allegedly caused the property damage. Officer Vazquez encountered Tremayne Flythe first, alleging that he fit the description of the person for whom they were looking. When encountered, Tremayne Flythe was walking with his dog eastbound on Kenyon Street, N.W., toward his mother's house which is located at 420 Kenyon Street, N.W. As he was walking, Mr. Flythe was confronted by defendant Vazquez who was in a marked cruiser heading the wrong way on a one-way street. JA 540-541.

A passerby, Sabrina Shapiro, described the events that then transpired thusly:

There was a man walking down the street. And he rolled down the window and started talking to him. And it very quickly escalated. The police officer got out of his car, and exchanged, or it looked like heated words. And suddenly -- it all happened within less than a minute, that he started talking to him, got out of his car, was exchanging very heated

words with him. The man rushes towards him. And the police officer
immediately draws his firearm and started shooting. At this point I had
been trying to get past them the whole time. But it all happened right in
front of me.

JA 531.  At about the same time, several people viewed some, if not all of what was

going on - - Mary Frances McCotter observed Officer Angel Vazquez stop Mr.

Tremayne Flythe in the 400 block of Kenyon Street, N.W. Mr. Flythe put his dog's

leash on a fence and walked toward the police car with his hands in the air, palms up.

The officer started shooting.  Mr. Flythe got his dog and ran from the scene.  Mr.

Flythe did not have a weapon.  JA 536-546; Linda Smith observed a police officer

arguing with Tremayne Flythe.  The officer had a weapon in his hand.  The police

officer was Hispanic.  The officer fired his weapon.  It appeared that Mr. Flythe had

been struck.  He was jumping back.  Mr. Flythe did not have a knife.  JA 560-564;

Jonathan L. Poole saw Tremayne Flythe in the street with his hands up, palms

forward.  There were shots and Mr. Flythe looked at himself, checking to see if he

had been hit by any of the shots, and started running.  He had been about 15 feet from

the police officer.  Mr. Flythe ran up the street with his dog.  The officer was still

firing when Mr. Flythe was 40 feet away from him.  He did not observe a knife or any

weapon in Mr. Flythe's hands.  JA 555, 557; Ms. Janean Willard observed the

confrontation between a police officer and Tremayne Flythe. She saw Mr. Flythe with

-7-

his hands in the air and his dog near a fence.  Mr. Flythe did not have a weapon.  JA 549-552.

The passerby, Ms. Shapiro, was so distressed by what she had observed, that she called her father, who is a lawyer, to see if she should call the police on the police, and then she called the police and told them that she had seen a police officer shooting an unarmed man. JA 534.  All of the civilian witnesses indicated  Tremayne Flythe was unarmed when he was being shot at by defendant Vazquez.

During the period when defendant Vazquez stopped shooting and was reloading his weapon, Mr. Flythe was able to retrieve his dog and run toward Georgia Avenue.  An eyewitness, Janean Willard,  vividly described what happened in that regard:

> He was defenseless, like pretty much. His dog was on the gate and he
> had his hands in the air. Okay. And after that I saw Tremayne Flythe run
> down the street towards his mom's house, running towards Park Place,
> and the police officer was continuing to fire at him, and then he turned
> around and ran back up toward Georgia Avenue. Before -- before he
> grabbed his dog, he stopped and put his hands in the air again and like
> checked himself to make sure he hadn't been hit. And then within that
> time the police officer was reloading his pistol and Tremayne grabbed
> his dog off the gate and continued to run up toward Georgia Avenue,
> and the police officer followed behind him and continued to open fire.

JA 549.

As he was running west on Kenyon Street toward Georgia Avenue, Mr. Flythe

-8-

and his dog Sandy were spotted from behind by Eagan & and the property owner, Mr. Hundal.  JA 505.  Eagan turned his vehicle so that he was behind Mr. Flythe on Kenyon Street going toward Georgia Avenue.  As they got close to Mr. Flythe, Eagan yelled at him to stop and got out of the police vehicle and started chasing Mr. Flythe. According to several witnesses, Eagan was shooting at Mr. Flythe as he was giving chase.   Ivan Cloyd (I looked up and I seen the suspect -- well, I seen him running when the officer was shooting at him) JA 577; Ursula Edmonds (as soon as the officer got out of his vehicle he started chasing the suspect and shooting at him). JA 581. Even Mr. Hundal, who was riding with Eagan indicated that when Eagan  exited his vehicle walked around the car, went over to the sidewalk . . .And when he got on the sidewalk, he started running behind the man . . . firing his weapon while he was running.  JA 506, 517.

Significantly, Mr. Hundal, who had gotten out of the vehicle when Eagan fired the first shot while still running after Mr. Flythe, does not indicate that Mr. Flythe made any sudden movements, flinched, moved his head or his shoulders.  What he does indicate, however, is that Mr Flythe was shot as soon as he stopped running, as ordered to do, and turned around to face Eagan.  *Id*.

The knife that was alleged to have been brandished by Flythe was brown and tarnished, not silver as alleged by Eagan.  JA 584.  Officer Raymond Bond, the

evidence technician assigned to the case testified in his deposition that Mr. Flythe's finger prints were not found on the knife and while Bond testified that he swabbed the knife for DNA, no evidence was produced by the District to indicate that it contained Flythe's DNA.  JA 568-569.

It is against the background of these facts, which refute and/or contradict every position taken by the defendants, that the trial court granted Eagan's motion for summary judgment and granted in part and denied in part the District and Vazquez's motion for summary judgment.

## V.  <u>SUMMARY OF ARGUMENT</u>

In granting summary judgment in favor of defendants District of Columbia and Eagan, in the absence of a single undisputed material fact in support of either of their motions, the trial court erred as a matter of law.  There was no justification for the trial court's refusal to allow cross-examination of defendant Eagan, or its exclusion of plaintiff's retained psychologist and toxicologist, or for the limits placed on plaintiff's ability to challenge the credibility of defendant  Eagan.  In addition, the trial court inappropriately refused to give the standard jury instructions requested by the plaintiff in favor of excerpts from published cases, disguised as jury instructions, that provided little or no guidance to the jury and which were more confusing than helpful.  The instructions complained of led to a verdict that reflected utter confusion

-10-

by the jury.  The trial court also granted a motion filed by the District of Columbia for set-off even though the District failed to comply with any of the legal requirements for such a remedy.

The actions of the trial court, singularly and in combination, deprived the plaintiff a fair trial in multiple respects, as such, summary reversal is mandated as is a new trial on the issue of damages with respect to the findings of liability against the District and defendant Vazquez.

## VI.  <u>ARGUMENT</u>

**A.     The Trial Court Erred As A Matter Of Law When It Granted Summary Judgment To The District Of <u>Columbia With Respect To Negligent Supervision</u>**

The District moved for summary judgment with respect to the issue of negligent supervision on the alleged basis that it was a claim that was duplicative and/or redundant and because the plaintiffs allegedly could not provide a "causal connection" between its alleged negligent conduct and the injuries suffered by Tremayne Flythe.  In opposition to the motion filed by the District, the plaintiffs retorted that:

> The claim for negligent supervision advanced by the plaintiff seeks direct liability against the District of Columbia and has nothing to do with the District's vicarious liability based upon the actions of its employees.  In sum, the plaintiff's claim of negligent supervision is premised on the actions of the supervisory police personnel who allowed

-11-

Travis Eagan to return to full duty, carry a firearm and exercise police
powers despite the fact that he was unfit to do so.

JA 642.

The D.C. Court of Appeals has made clear the law governing negligent

supervision:

> To invoke this theory of liability it is incumbent upon a
> party to show that an employer knew or should have
> known its employee behaved in a dangerous or otherwise
> incompetent manner, and that the employer, armed with
> that actual or constructive knowledge, failed to adequately
> supervise the employee.

*Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. App. 1985), see also *Brown v.*

*Argenbright Sec. Inc.*, 782 A. 2d 752, 760 n.10 (D.C. 2001).

Mr. Eagan, an officer who was determined to be unfit for duty and was ordered

to undergo a fitness for duty examination, JA 586, 607-08, was returned to duty,

notwithstanding that directive, by a civilian employee of the MPD, who had been

inexplicably delegated such power by a MPD Commander, even though the required

examination had not been conducted. JA 609-14. When the examination was finally

conducted, it was discovered that the unfit employee was a user of illegal drugs and

he was then fired. JA 528. In the time between when he was inappropriately returned

to full duty, given his gun and authorized to exercise police powers and when it was

discovered that he was using illegal drugs, Mr. Eagan shot Tremayne Flythe to death.

-12-

In its motion, the District's position was that the trial court should ignore the evidence indicating negligence on its part in putting Mr. Eagan back on the street without him undergoing a fitness for duty examination because in its view this "is merely a cause in fact of an injury; it is not the legal cause." JA 358. It was the District's position that this gibberish entitled it to summary judgment with respect to the issue of negligent supervision. However, the only "cause" that is relevant is proximate cause and the plaintiff's position as to proximate cause was clearly set forth by her psychologist, Dr. R. Bronson Levin:

> Because a police officer who hasn't slept, who is weak, who is irritable, who is demonstrating some paranoid thinking, who is generally performing below functional level, who has been referred for a fitness evaluation, fitness-for-duty evaluation, which has not yet been performed, should not be exposed to the public just because an incident like this can happen. As I mentioned, their reaction time would be less, their processing of information would be poorer, their experience of threat would be higher. Their ability to see alternative solutions would be lessened.

JA 571-72.

It was further explained by plaintiff's police practice expert, Timothy Longo:

> By allowing Officer Travis Eagan to retain his police powers, the District of Columbia and the District of Columbia Police Department created a foreseeable risk of constitutional harm that led to the death of Tremayne Flythe.

-13-

JA 890.

No rational argument could be made that the District of Columbia, when it put defendant Eagan back on the street, gave him police powers and put a gun in his hand did not engage "in the employment of improper persons or instrumentalities in work involving risk or harm to others" in direct contravention of §213 of the Restatement of Agency. A reasonable jury could certainly have found that to be the case and further have concluded that the District's negligence was a proximate cause of the injuries suffered by Tremayne Flythe, consistent with the Standardized Civil Jury Instructions for the District of Columbia §5.12.

Moreover, because there can be more than one proximate cause of an injury, *Id*. at §5.13, liability could easily have been established directly against the District of Columbia. Therefore, summary judgment clearly was not available for the District of Columbia with respect to negligent supervision based upon any argument presented to the trial court.

The trial court did not rule based upon the motion filed by the District and the opposition thereto instead, it based its ruling on a separate and distinct issue:

> Therefore, because the plaintiff did not put forth expert testimony on the relevant standard of care as to the restoration of a police officer's powers and the subsequent supervision of that officer, the Court grants the defendant's motion for summary judgment on this issue.

-14-

JA 829.  Although startled by the trial court's ruling, the plaintiff noted in her motion

to alter or amend that it is pretty well settled that in the District of Columbia,

"discipline of police officers . . . is not a matter which laymen are incapable of

intelligently evaluating without the assistance of expert testimony."  *Daskalea v.*

*D.C.*, 227 F.3d 433, 445 (D.C. Cir. 2000), citing *Morgan v. District of Columbia*, 449

A.2d 1102, 1108 & n.3 (D.C. 1982), *rev'd on other grounds*, 468 A.2d 1306 (1983)

(en banc).

More significantly, however, the plaintiff pointed out that the trial court had

completely failed to adhere to the requirements of the Federal Rules of Civil

Procedure in assessing the motion for summary judgment.  Since the issue of expert

testimony or the lack thereof was not an issue raised by the moving party, and was

instead raised sua sponte by the trial court, F.R.C.P. *Rule* 56(f) was implicated:

> Judgment Independent of the Motion. **After giving notice and a**
> **reasonable time to respond, the court may**:
>
> (1) grant summary judgment for a nonmovant;
>
> (2) grant the motion on grounds not raised by a party; or
>
> (3) consider summary judgment on its own after identifying for the
> parties material facts that may not be genuinely in dispute.

Under the guidance of *Farouki v. Petra International Banking Corp.*, 705 F.3d 515,

517 (D.C. Cir. 2013), the trial court's action constituted reversible error.  On the flip

side, had the trial court  complied with *Rule* 56(f), it would not have erroneously assumed that the plaintiff did not have a retained expert to opine regarding the issue of negligence.[3]   The issue of expert testimony only became an issue when the trial court, sua sponte and erroneously, made it an issue.

In her motion to alter or amend, the plaintiff informed the trial court that she did in fact have an expert, Timothy J. Longo, Sr., the current Chief of the Charlottesville, Va., Police Department, and that he was prepared to testify, as indicated over ten (10) pages of his thirty-two (32) page report, clearly, concisely and unequivocally that the District of Columbia negligently supervised defendant Eagan. JA 860-92.  Even though the trial court, in granting the District's motion for summary judgment regarding the issue of negligent supervision had opined that:

> The critical issue then becomes whether, in light of MPD's concerns about Officer Eagan, expert testimony is needed to determine whether MPD failed to adequately supervise him.

JA 827, and stated unequivocally that

> because the plaintiff did not put forth expert testimony on the relevant standard of care as to the restoration of a police officer's powers and the subsequent supervision of that officer, the Court grants the defendant's motion for summary judgment on this issue.

---

[3]/ The trial court's criticism of plaintiff for not having a police practice expert is strange in any event since the District included a portion of Chief's Longo's report as Exhibit 8 to its motion for summary judgment.  JA 470-471,

JA 829, it changed positions when it denied plaintiff's motion to alter or amend and stated that "the failure to proffer expert testimony was not the court's only reason for entering judgment for the District on the negligent supervision claim." JA 1183. It may not have been, but it was certainly the only one set forth by the trial court. The trial court took the position, in denying plaintiff's motion to alter or amend, that "judgment must still be entered for the District on this claim because the plaintiff cannot establish proximate cause as a matter of law." JA 1184.

However, it is somewhat axiomatic that proximate cause is a factual issue to be resolved by the jury and only becomes a question of law **when the evidence adduced at trial will not support a rational finding of proximate cause**. *Majeska v. D.C.*, 812 A.2d 948, 950 (D.C. 2002); *Washington Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D.C. 1992). The clear meaning here is that the question of proximate cause is to be decided by the jury in the first instance, and not by the trial court. The Supreme Court has been definitive on this point,

> The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.

*Exxon, U.S.A. v. Sofec, Inc*., 517 U.S. 830, 841-42 (1996); *Smith v. District of Columbia*, 413 F.3d 86, 102-03 (D.C. Cir. 2005).

In this case, the trial court's determination that no reasonable jury could find

-17-

that the District of Columbia's actions in placing an officer, whose supervisor had

determined to be unfit for duty and should not have been returned to duty prior to

having a fitness for duty examination, JA 587-603, and for whom the evidence would

show was sleep deprived, and on the medication that Mr. Eagan was on "should not

be exposed to the public just because an incident like this one can happen, JA 571-72,

was **a** proximate cause of the shooting death of Tremayne Flythe, not only invaded

the province of the jury, it also defied all reason and logic.

In sum, the trial court erred as a matter of law when it granted summary

judgment in favor of the District on the issue of negligent supervision and

compounded that error when it denied plaintiff's motion to alter or amend.

### B.    The Trial Court Ignored Facts That Were Unfavorable To Defendant Eagan In Granting Summary Judgment On Plaintiff's § 1983 Claim

Even though the trial court acknowledged that:

> In determining whether there exists a genuine issue of
> material fact sufficient to preclude summary judgment, the
> court must regard the non-movant's statements as true and
> accept all evidence and make all inferences in the non-
> movant's favor.

JA 808, it did the complete opposite in deciding defendant Eagan's motion.  For

reasons that cannot be discerned, the trial court was determined to rely upon the facts

most favorable to defendant Eagan when it analyzed his  motion for summary

-18-

judgment.

> The facts available to Officer Eagan were as follows: a fellow officer (Vazquez) was out looking for the same suspect, and he heard a radio transmission in which Vazquez referred to the suspect having a knife and "try[ing] to stab" him. He also heard a gunshot over the radio, saw Officer Vazquez running with his weapon out and looking distressed. When he finally engaged Mr. Flythe (who at this point he thought was dangerous based on the radio transmissions and Officer Vazquez's armed pursuit of him), he ordered Mr. Flythe to stop. Mr. Flythe did not stop, but instead turned around, yelled, reached toward his waistband of his pants which contained a knife, and raised it up at him. Officer Eagan told Mr. Flythe to drop the knife and he did not; and Officer Eagan told Mr. Flythe to yield and he would not.

JA 820.  Even defendant Eagan does not claim that he saw Vazquez "looking distressed" or that he heard a radio transmission where Vazquez indicated that the suspect was "trying to stab him."  Further, Eagan never claimed to have ordered Flythe to stop, he claims to have ordered him to get on the ground and Eagan never uses the word "yield" in any communication that was part of the record below. Nonetheless, the trial court determined that

> In light of the facts confronting Officer Eagan at the time he fired his weapon, it was objectively reasonable for him to believe that Mr. Flythe posed a threat to him of serious physical harm. Officer Eagan acted as a reasonable officer would have confronted with the same circumstances.

That conclusion is flawed for several reasons.  The most glaring is that the trial court refused to acknowledge that a coin has two sides and refused to give the plaintiff the

-19-

benefit of any favorable evidence without a challenge to its credibility or value.

For example, the Court ignored and in fact attempted to minimize defendant Eagan's drug use.  There is no dispute that former Officer Eagan was fired for the use of illegal drugs.  That is not and never has been a disputed issue in this case. However, the trial court stated "It is not clear from the record why those drugs were in Officer Eagan's system in the first place, or whether they had been in his system on the night of December 26, 2009." JA 821at n.10.  The trial court went on to opine that "whether Officer Eagan was under the influence of amphetamines at the time of his encounter with Mr. Flythe is irrelevant."  JA 821.  It is not unusual for an individual caught driving a motor under the influence of methamphetamine to be arrested and charged with driving under the influence and/or driving while impaired. If any law enforcement officer were discovered to be under the influence of methamphetamine at roll call, he/she would be immediately placed on administrative leave while disciplinary action was contemplated.

Unswayed, the trial court concluded that:

Based on the facts he confronted - a radio transmission alerting him to a fleeing suspect with a knife, who "tried to stab" another officer - Officer Eagan's use of deadly force was objectively reasonable and any reasonable officer in his position would have acted similarly.  The fact that his subjective mental state may have been impaired does not change the fact that based on the objective facts before him, he still acted as a reasonable officer would have in the situation.

-20-

*Id*.  The trial court took the position that once the police have a basis to use deadly force,  they maintain the right to use deadly force no matter when the suspect is encountered.  In support of its position, it identified *Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988), even though that case merely stands for the proposition that since officer Berry did not testify at trial that he saw a weapon or anything resembling a weapon

> evidence that Sherrod was unarmed is irrelevant for impeachment purposes, and the jury must determine the reasonableness of Berry's actions limited to the facts known to Berry when he acted, no more and no less. Having ruled that evidence establishing that Sherrod was unarmed is immaterial to the question of the reasonableness of the officers' actions under the totality of the circumstances, we are impelled to conclude that the trial court's error in admitting the evidence was also unfairly prejudicial to the defendants.

Id. at 806-07.  To say that the trial court's position  is not a universal opinion, would be an understatement.  *Lytle v. Bexar County Tex*., 560 F. 3d 404, 413 (5th Cir. 2009), (an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased); *Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.");

*Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). Accordingly, even if it were assumed that Tremayne Flythe had a knife when he encountered defendant Vazquez, no objectively reasonable basis would have existed for defendant Eagan to just shoot him simply because he had heard over a radio that Tremayne Flythe had a knife at one point and had tried to stab an officer sometime earlier. At the very least, defendant Eagan was required to articulate facts that would justify the use of deadly force.

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Clearly, the trial court acted erroneously when it dispensed with defendant Eagan's illegal drug use by calling his use of force reasonable because of what he thought he heard in a radio transmission.[4] Defendant Eagan did not indicate that he

---

[4]  According to defendant Eagan, "I drew my weapon because I had heard (continued...)

fired his weapon at the point that he first encountered Tremayne Flythe, he claimed that Mr. Flythe turned to face him and was advancing on him when he was shot. Defendant Eagan never claims to have seen a knife until after Mr. Flythe turned around to face him.  In fact, defendant Eagan claims that Tremayne Flythe grabbed the knife from his waistband. "He was close to me (I estimate 3') and kept coming at me, raising the knife as he did so.  As he held the knife, the handle of the knife was pointed up and the blade was pointed down.  As this was occurring, I ordered him to 'drop the knife, drop the knife or I'll shoot,' and then I fired as he continued to come at me . . . As soon as I fired, the suspect fell to the ground."  JA at 208-09 ¶¶ 17-18.

The trial court on the one hand acknowledged that there were witnesses who painted an entirely different picture of what happened than did defendant Eagan, and on the other dismissed  all such testimony by stating that it does "nothing to put his version of events into material dispute - none of the eyewitnesses can say, or see, whether Mr. Flythe had a knife."[5]  JA 822.

---

[4](...continued)
Officer Vazquez mention a knife in one of his radio transmissions and I heard what sounded like a gunshot during his radio transmission.  I thought that the suspect was armed and that he may have harmed Officer Vazquez.  JA at 208 ¶14.

[5]  Oddly, the trial court conceded that the plaintiff had produced evidence that cast a doubt on whether Tremayne Flythe had a knife during his interaction with defendant Vazquez yet determined that the plaintiff had not done so with respect to
(continued...)

Indeed, the trial court even tried to minimize the fact that every witness to the shooting observed defendant Eagan running behind and shooting at Mr. Flythe, even Mr. Hundal. The trial court undermined Mr. Hundal's recall abilities by reference to his "poor English skills." JA 806 at n.2. (The correlation between speaking English well and having a good memory was not explained). The trial court also pointed out that the autopsy report indicated that Mr. Flythe was shot from the front and therefore, the suggestion that Eagan was running at him and shooting at him from behind was not credible. What the trial court failed to address was the fact that defendant Eagan discharged his weapon a total of five (5) times. Mr. Flythe was shot twice. Therefore, defendant Eagan missed the three shots that he fired while he was chasing Mr. Flythe and the two(2) that hit him were the ones that he fired when Mr. Flythe stopped and turned around as ordered. That is what viewing the evidence in the light most favorable to the plaintiff shows. It is only when the evidence is viewed in the light most favorable to the movant can one see things as the trial court did.

In the trial court, defendant Eagan indicated that Tremayne Flythe had a knife.

---

[5](...continued)
Mr. Flythe's interaction with defendant Eagan. The trial court provided no explanation as to how it concluded that the knife materialized between the time that Mr. Flythe was being chased and shot at by Vazquez and the time that he was shot and killed by Eagan. JA 802-04, 832. The trial court's logic chain was missing a few links.

JA 209. The alleged knife supposedly wielded by Tremayne Flythe was a material issue that was genuinely in dispute. No fingerprints, no DNA, brown blade as opposed to silver, and witnesses who indicated that they approached the scene shortly after the shooting, before any other police officers arrived on the scene and that they did not see a knife near Mr. Flythe, even defendant Vazquez indicated that he did not see a knife near Mr. Flythe. The trial court's determination that because Mr. Eagan says that he saw a knife, and that was dispositive of the issue, was erroneous as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

The evidence most favorable to the plaintiff, prior to the shooting of Tremayne Flythe was extensive:

As he was running west on Kenyon Street toward Georgia Avenue, Mr. Flythe and his dog Sandy were spotted from behind by Eagan & Hundal. JA 505. Eagan turned his vehicle so that he was behind Mr. Flythe on Kenyon Street going toward Georgia Avenue. As they got close to Mr. Flythe, Eagan yelled at him to stop and got out of the police vehicle and started chasing Mr. Flythe. JA 507. According to several witnesses, Eagan was shooting at Mr. Flythe as he was giving chase. Ivan Cloyd (I looked up and I seen the suspect -- well, I seen him running when the officer was shooting at him) JA 577; Ursula Edmonds (as soon as the officer got out of his vehicle he started chasing the suspect and shooting at him). JA 581. Even Mr. Hundal, who was riding with Eagan indicated that when Eagan exited his vehicle walked around the car, went over to the sidewalk . . .And when he got on the sidewalk, he started running behind the man . . . firing his weapon while he was running: JA 508, 517.

Eagan continued to tell Mr. Flythe to stop, even though he was running behind

-25-

him shooting at him.  And when he finally stopped and turned around, Eagan shot

him dead, as explained by Mr. Hundal:

> Q.  I want to make sure I understood your testimony. But Officer Eagan was saying, "Stop, stop."
>
> A. Yes.
>
> Q. And Mr. Flythe was running away.  But then he turned around?
>
> A. Yes. At that time I heard the sound.
>
> Q.  Slow  down.  Mr. Flythe  turned  around  and,  if  I understood what you said, he and Officer Eagan got closer together?
>
> A. Yes.
>
> Q. Would it be fair to say, then, that he was facing Officer Eagan?
>
> A. Yes.
>
> Q. And Officer Eagan was facing him?
>
> A. Yes.
>
> Q. And then what happened?
>
> A.  I heard the sound, the shot.
>
> Q. And you didn't see what happened between them?
>
> A. No, I didn't.

Q. Other than the fact that Mr. Flythe turned around?

A. Yes.

Q. Went face to face with Officer Eagan?

A. Yes.

Q. And then you could see the tops of their heads?

A. Yes.

Q. And maybe shoulders?

A. Shoulders, yes.

Q. Then you heard shots?

A. Yes.

JA 518-19. Mr. Hundal, who had gotten out of the vehicle when Eagan fired the first

shot while still running after Mr. Flythe, does not indicate that Mr. Flythe made any

sudden movements, flinched, moved his head or his shoulders.  What he does

indicate, however, is that Mr Flythe was shot as soon as he stopped running, as

ordered to do, and turned around to face Eagan. *Id*.

    The trial court, for whatever reason, consistently ignored the evidence that was

favorable to the plaintiff and dismissed the testimony of eyewitnesses to the event by

labeling their testimony  "hesitant and inconclusive."  Even the testimony of

defendant Vazquez.  JA 833.  In the context of a motion for summary judgment, the

-27-

trial court is obligated to view the evidence in the light most favorable to the non-moving party, not make credibility determinations. It has long been established that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby at* 477 U.S. 249. Unfortunately, the trial court failed to adhere to this well-established principle of American jurisprudence. The trial court's weighing of the evidence, dismissal of evidence that was favorable to the plaintiff, assumptions made about the evidence favorable to the defendants and its outright refusal to view the evidence in the light most favorable to the plaintiff or give her the benefit of any reasonable inferences, led to the legally untenable decision to grant summary judgment in favor of defendant Eagan with respect to plaintiff's § 1983 claim and deny plaintiff's motion to alter or amend. Because there are no undisputed material facts entitling Mr. Eagan to summary judgment, the trial court's summary judgment decision and the denial of plaintiff's motion to alter or amend should be reversed.

### C.   The Trial Court Denied The Plaintiff A Fair Trial When It Refused To Allow The Jury To Hear And Render A Verdict Based On The Evidence And Facts Available

Prior to trial, the trial court excluded the testimony of plaintiff's experts Dr. Myron Weiner, and Dr. Bronson Levin; prevented plaintiffs' police expert, Chief

Timothy Longo from testifying about the supervision and fitness for duty of defendant Eagan; and prohibited the plaintiff from introducing any witness or exhibit setting forth the truth about defendant Eagan's employment and termination of employment with the Metropolitan Police Department.  Specifically, the trial court prevented the plaintiff from introducing any evidence about "Officer Eagan's fitness for duty before or during the shooting incident, or his positive drug test and termination after the incident."  JA 1282.  As a result of the rulings of the trial court, the plaintiff did not receive a fair trial or fair opportunity to present her case for damages against defendant Eagan.

### 1.      Bronson Levin, Ph.D

R. Bronson Levin, Ph.D, was plaintiff's designated psychologist.  His opinion was set forth as follows:

> On 12//26/09, Metropolitan Police Department (MPD) Officer Travis Eagan fatally shot Tremayne Flythe.  After reviewing depositions and records from MPD and treating personnel, it is my professional opinion that, at the time of the above incident, Officer Eagan should not have been allowed to serve as a police officer on the street with a weapon since his fitness for duty had not been established.  His incapacity was due to a severe sleep disorder, other emotional and physical disorders, and the illegal use of methamphetamine.  The combination of these conditions disrupt mental status, concentration, alertness, and ability to response to crisis.  Officer Eagan's judgment is also in question.

JA 958.

-29-

Dr. Levin was deposed and stated the following about Mr. Eagan, on December

26, 2009, the day of the shooting:

Q And there's no evidence that you reviewed that would establish that
he was mentally unable to  process and react to that situation on
December 26th, is there?

A Okay, I'm going to disagree with that --

Q Okay.

A -- strongly, because these conditions that he's suffering from don't
happen in isolation, they  affect the entire being of the person.  I do not
-- it's my opinion that somebody with these kinds of conditions should
not be confronting that kind of crisis because they're ill equipped.  Now
whether he dealt with it properly or not is not my testimony; again, that's
somebody else's.  But I can testify that he was ill equipped for handling
a crisis situation of that magnitude, particularly carrying a weapon and
having to react quickly and having to assess a situation quickly.  I do not
believe a police officer should be on the streets to face that kind of
situation, given the conditions that he had.

Q Okay, this is critical, what you just said, so I want to try to paraphrase
it and I want you to listen carefully.

A Okay.

Q As I understand what you're saying it's that because of the various
elements that you've described  already, you believe that he should not
have been put on the street to perform police duty.

A Correct.

Q But what you are not saying, you are not saying is that in dealing with
the specific incident which occurred on December 26, 2009, that he was
not competent to handle that specific incident at that  specific time.

-30-

A No, that is what I'm saying. What I'm not saying is whether he should
or shouldn't have fired his weapon. What I am saying is that he was not
fit for making that kind of determination.

JA 989-91.

Clearly, based upon his opinions as set forth above, the testimony of Dr. Levin

would have assisted the proper fact finder, the jury, in assessing the conduct of Mr.

Eagan and of the District of Columbia in putting Mr. Eagan in the position where he

was forced to make the determinations that were required on December 26, 2009.

The trial court determined that the testimony of Dr. Levin had to be excluded

because "Officer Eagan's subjective judgment is not probative on the issue of the

objective reasonableness of his actions." JA 1285.  Dr. Levin was proposed to testify

regarding the propriety of the District of Columbia placing a man suffering from the

ailments and addictions of Mr. Eagan on the streets of the District of Columbia with

a firearm, and to testify about how his ailments, personal issues, and drug ingestion,

both legal and illegal would have affected his mental state before and at the time of

the shooting incident.

The trial court erroneously granted summary judgment to the District of

Columbia with respect to plaintiff's claim of negligent supervision because it

determined that whether or not the District of Columbia was negligent in placing a

sleep deprived, drug ingesting police officer whose supervisor did not believe that he

-31-

was capable of performing his job and who should not have been given a firearm

without a fitness for duty examination, was not **a** proximate cause of the death of

Tremayne Flythe at the hands of that sleep deprived, drug ingesting, and admittedly

unfit for duty officer.

As to the issue of Mr. Eagan's mental state, the plaintiff deemed it relevant to

show that Mr. Eagan's ability to recall, assess, and relate the facts would have been

diminished by his drug ingestion, both legal and illegal, combined with physical and

mental health related issues.   Dr. Levin clearly indicates in his report that the

combination of Mr. Eagan's conditions "disrupt mental status, concentration,

alertness, and ability to response to crisis."   JA 958.   The trial court nonetheless

excluded his testimony by indicating that Dr. Levin's "opinion is not probative on the

issue of Officer Eagan's reasonableness that day."   JA 1286.

Mr. Eagan indicated in his deposition that Tremayne Flythe was running on the

sidewalk, ran past him by 3 or 4 feet, turned and started advancing on him with a

knife in his left hand.   He further indicated that he told Mr. Flythe several times to

drop the knife or I'll shoot, and when Mr. Flythe continued to advance on him that

is when he discharged his weapon. JA 140-141.   Three witnesses, Ms. Edmonds, Mr.

Cloyd and Mr. Hundal all refute Mr. Eagan's version of the shooting.   All three

indicate that Eagan was shooting at Flythe while he was running away from him,

neither heard the officer say anything, and Mr. Hundal specifically recalled that

Eagan shot Mr. Flythe when he stopped running and turned around to face Eagan.

Contrary to the trial court's view, Dr. Levin could have provided probative testimony

regarding Mr. Eagan's disrupted mental status, and the effect that his severe sleep

disorder to help the plaintiff explain the why it was that Mr. Eagan either saw and/or

recalled the events surrounding the shooting incident so very differently than three

(3) independent witnesses.

There was no legitimate basis for excluding the testimony of Dr. Levin, while

allowing Mr. Eagan to testify. His credibility was at issue just like any other witness.

His mental condition, the drugs that he was taking, the distractions that he may have

had, all help a jury determine the weight to give his testimony. The trial court

determined that anything relating to the mental health or ability of Mr. Eagan to

communicate, and/or recall the facts would be more prejudicial than probative even

though Mr. Eagan admitted that there were certain things that he did not recall from

the day of the shooting. JA 56 - x23.

F.R.E. 403 provides:

Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of
the issues, or misleading the jury, or by consideration of undue delay,
waste of time, or needless presentation of cumulative evidence.

In interpreting this Rule this Court has pronounced

> When the District Court excludes admissible evidence based on an understatement of the probative value of the excluded evidence, a miscalculation of the "danger of unfair prejudice, confusion of the issues, or misleading the jury," or an erroneous calculation of whether the "probative value" of the excluded evidence is "substantially outweighed" by these dangers (or by "consideration of undue delay, waste of time, or needless presentation of cumulative evidence"), then the trial court's judgment under Rule 403 is subject to reversal.

*Henderson v. George Washington University*, 449 F.3d 127, 133 (D.C. Cir. 2006).

More significantly, this Court has made it clear that a trial court must be "cautious" against excluding evidence "where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial." *United States v. Watson*, 409 F.3d 458, 463 (D.C. Cir. 2005)

The trial court abused its discretion when it excluded the testimony of plaintiff's psychologist, R. Bronson Levin.

### 2.    <u>Myron Weiner, Ph.D</u>

Dr. Weiner was plaintiff's retained toxicologist.  His general opinion was as follows:

> I believe to a reasonable degree of pharmacological/toxicological certainty that Mr. Eagan's positive urine test for methamphetamine and amphetamine on December 30, 2009, was the result of his having used an illegal substance, methamphetamine, along with a legitimate prescription for Adderall XR (amphetamine); that this illegal use of methamphetamine was a substance abuse situation; and that his behavior

-34-

at the time of the shooting would have been modified in a negative behavioral/emotional/psychological way by the combination of methamphetamine, amphetamine, zolpidem, clonazepam and Mirapex.

JA 1139. Mr. Eagan admitted in his deposition that the same drugs that were in his system on December 30, 2009, the day of his drug test, are the same drugs that would have been in his system on the day that he shot Mr. Flythe.

Q Are there any drugs that you used on December 28, 29, or 30 that you didn't use on December 24, 25, and 26?

A Not to my recollection?

JA1216. Thus, it is undisputed that drugs were in Mr. Eagan's system at the time of the shooting and Dr. Weiner would have been called to testify as to the properties of those drugs and their expected effect upon an individual who has ingested them as prescribed, or as indicated by the levels detected.

The only defense in the litigation below was "privilege." The plaintiffs, in order to prove their case, necessarily had to challenge the facts relied upon in support of the alleged privilege. No other witness supports any aspect of Mr. Eagan's rendition of the facts surrounding his encounter with Mr. Flythe.

There is no real question that drug use bears heavily on the capacity of an individual as a witness. A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired. Consequently,

-35-

the witness's capacity at the time of the event, as well as at the time of trial, is significant. *U.S. v. Robinson*, 583 F.3d 1265, 1272 (10th Cir.2009). Congruently, defendant Eagan, who has admitted drug use on the day of the shooting should not have been allowed to testify, unchallenged, regarding his actions and those of others because his capacity to observe, remember and/or narrate was unequivocally in dispute.

The fact that Mr. Eagan was allowed to testify, and the plaintiff was prohibited from presenting evidence that would have called his credibility into question in terms of his capacity to observe, remember and/or narrate the operable facts and how his capacity may and/or was compromised by the use drugs, was a manifest injustice. The trial court protected Mr. Eagan at the expense of the plaintiff. There was nothing fair about what it did. Tremayne Flythe, the only person who could directly refute everything that Mr. Eagan said, is dead. He was killed by Travis Eagan who was allowed to give his version of events but the plaintiff was not allowed to challenge that version based upon his ability to observe, remember and/or recount the facts due to the fact that he was under the influence of drugs, both legal and illegal. There was nothing fair about that. Mr. Eagan admitted that he took drugs on the day of the shooting and the trial court nevertheless determined that to allow the plaintiff's toxicologist to tell the jury the effect of those drugs on his mental state would be

-36-

more prejudicial than probative.   This Court's decision in *United States v. Sampol*,

636 F.2d 621(D.C. Cir. 1980), does not support the trial court.  The requirement that

this Court has established is that

> counsel must establish a foundation showing either that the witness was
> using drugs at the time he observed the events in dispute, or that he is
> under the influence of narcotics while testifying.

*Id*. at 667.  As noted above, Mr. Eagan himself admits that he was ingesting drugs on

the day of the shooting.  JA 1216.  Consequently, a foundation was unequivocally

established that he was using drugs at the time "he observed the events in dispute."

The trial court improperly excluded the proposed testimony of Dr. Weiner.

### 3.     <u>Timothy Longo</u>

The trial court also limited the testimony of plaintiffs' police practices expert.

This expert was prepared to testify that the facts and circumstances surrounding Mr.

Eagan's employment in the months preceding the shooting constituted reckless,

indifferent, grossly negligent conduct,  on the part of the District of Columbia, that

the shooting incident involving Mr. Eagan was entirely foreseeable, that there were

a number of actions that the District could and should have taken that would have

prevented this incident and that the actions and/or inactions of the District were a

substantial factor in the death of Mr. Flythe.  In other words, the reckless, indifferent

and grossly negligent actions of the District of Columbia were **a** proximate cause of

the shooting death of Mr. Flythe. JA 881-91. There was nothing unfairly prejudicial or inappropriate about such testimony. The trial court abused its discretion in limiting Chief Longo's testimony.

### 4.    The Exclusion Of All Other Evidence Challenging the Credibility of Mr. Eagan

The trial court also protected Mr. Eagan by granting the defendants' motion for an order "excluding the examination of any witnesses, introduction or use of exhibits, or the elicitation of testimony or presentation of evidence of any kind relating to Officer Eagan's fitness for duty before or during the shooting incident or his positive drug test after the incident." JA 1291. In addition, to protect Mr. Eagan further, the trial court further stated - - any evidence as to Officer Eagan's mental state or drug use on the day of the shooting will be presumptively excluded." JA 1292. And lastly, to assure that the jury had absolutely no reason to believe that the unfit, incompetent, drug abusing, and ultimately fired police officer who had taken the life of plaintiff's decedent was nothing other than a choir boy, the trial court ruled - - "Finally, the jury will not be allowed to hear why Officer Eagan is no longer a member of the MPD . . ." JA 1293.

The plaintiff was basically prevented from challenging the story told by the only surviving eyewitness to the entire shooting incident. Among other things, the

-38-

plaintiff was precluded from presenting evidence about how Mr. Eagan had lied about his health issues and medications to his employer, and the plaintiff was precluded from presenting evidence as to how Mr. Eagan had lied and finagled his way out of the fitness for duty examination in October 2009, in addition to his drug abuse, and physical and mental health issues.  The trial court, in ruling as it did, reiterated that it was of the opinion that Mr. Eagan had acted in an objectively reasonable fashion based upon its view of the evidence.  JA 1291.

Notably, the trial court improperly granted summary judgment regarding plaintiff's claims against Mr. Eagan, and it did nothing here but continue with that mindset.  No objective analysis of Mr. Eagan's version of the facts surrounding the shooting death of Tremayne Flythe indicates that those facts are undisputed.  In fact, at the trial of this case, a jury, after hearing just the streamlined version of the facts in this case that the trial court allowed the plaintiff to present, determined that an assault and battery occurred when Mr. Flythe was shot dead.

Succinctly stated, the trial court deprived the plaintiff of a fair trial with respect to her claims against Travis Eagan, by wrapping him in a credibility repelling cocoon.

### D.    The Trial Court Committed Reversible Error When It Unfairly Precluded Meaningful Cross-Examination Of Travis Eagan

Even in a civil lawsuit, "cross-examination of a witness is a matter of right."

-39-

*Du Beau v. Smither and Mayton, Inc.*, 203 F.2d 395 (D.C. Cir. 1953)(citations omitted). F.R.E. 611(b) provides that a party is always allowed to explore matters affecting a witnesses credibility. "[No] testimony under any condition can be received without liability to a substantially full cross-examination." 8 J. Wigmore on Evidence, § 2276(7) at 474 (McNaughton rev. 1961). The critical issue in this case, as is the case in most shooting incidents, was credibility. Sometimes that can be addressed with witnesses and/or physical evidence. Other times it turns on the whether or not the survivor can be believed. F.R.E. 611(b) provides that a party is always allowed to explore matters affecting a witnesses credibility. "[No] testimony under any condition can be received without liability to a substantially full cross-examination." 8 J. Wigmore on Evidence, § 2276(7) at 474 (McNaughton rev. 1961). Mr. Eagan's credibility should have been fair game on cross-examination. The plaintiff should have been allowed to question Mr. Eagan about his ability to observe, remember and/or narrate the operable facts, and the effect that his mental or physical condition and/or his drug use had on that ability which is at the very heart of a credibility assessment.

In *Alford v. United States*, 282 U.S. 687 (1931), the Supreme Court reversed a conviction because the trial court refused to allow cross examination of a Government witness as to his place of residence where defense counsel had some

information that the witness was in custody of federal officials. There, the Court held that "Cross-examination of a witness is a matter of right." Id. at 691.

In *United States v. Kearney*, 420 F.2d 170 (1969) this court recognized that "in general it is undeniable that it may be proper to develop the matter of drug addiction in an effort to attack a witness's competency and capacity to observe, remember and recall." 420 F.2d at 173. However, the Kearney court went on to note:

> The issue of narcotics use is one that may properly be handled with some sensitivity lest it result in undue and unnecessary prejudice. There is an interest in avoiding undue evidentiary assault on prosecution witnesses. Prejudice may result if questions asked for the limited purpose of testing, say, opportunity to observe, are permitted to generate a hostility based on the general odium of narcotics use.
>
> A judge may not fairly block all probing of an issue like narcotics use by the prosecution's sole eye witness to a murder. On the other hand, as defense trial counsel himself recognized, the matter of drug addiction, which involves social transgression and the possibility of illegal conduct, is properly approached with awareness of the potential for prejudice of the jury. In some cases the desirable procedure may lie in permitting defense counsel to establish his foundation by questioning the witness out of the hearing of the jury, as is commonplace in a hearing preceding a determination of a witness's competency. (Emphasis added.)

420 F.2d at 174.

Thus, it is clear that a trial judge must exercise discretion concerning the proper scope of cross-examination of a witness regarding his alleged use of narcotics, due to the highly inflammatory nature of such an allegation. Here the trial judge precluded

-41-

all cross-examination regarding Mr. Eagan's illegal drug use even though 1) he was fired from the police department because he tested positive for methamphetamine use, JA 56 x-15; 2) he was determined to be unfit for duty and ordered to undergo a fitness for duty examination, which would have included drug testing, two (2) months before the shooting incident, JA 56 x-2; and 3) plaintiff's toxicologist was prepared to testify that Mr. Eagan's "behavior at the time of the shooting would have been modified in a negative behavioral/emotional/psychological combination of methamphetamine, amphetamine, zolpidem, clonazepam and mirapex." JA 1139.

In addition, the trial court refused to allow the plaintiff to question Mr. Eagan about, or even mention, that Mr. Eagan suffered from several health issues including a sleep disorder and that he took numerous prescription drugs. JA 1291. The trial court took this action despite the fact that Mr. Eagan admitted that his medical ailments sometimes affected his ability to perform his job, JA 56 x-4-6, and despite the fact that plaintiffs' experts were prepared to testify that Mr. Eagan's ability to perform his job would have been adversely affected by his medical condition and use of drugs, both legal and illegal.

The trial court imposed these restrictions before trial. At trial, Mr. Eagan was allowed to present 37 pages of trial testimony regarding his actions, perceptions, understanding and comprehension of the facts surrounding the shooting of Tremayne

Flythe.  JA 1848-85.  Prior to starting his cross examination of Mr. Eagan, counsel

for the plaintiff revisited this matter with the trial court and stated the following:

> Mr. Eagan has testified clearly and repeatedly that the reason for
> the discharge of his weapon was because he perceives - - first of all, his
> testimony has been that the knife was in the right hand today, it was in
> the left hand during deposition.  He has testified the sole reason that he
> fired his weapon - - let me back up again.  He also said that when Mr.
> Flythe was running, he didn't see a knife; therefore, he didn't discharge
> his weapon.  He saw a knife when Mr. Flythe jumped and turned and
> reached into his waistband and pulled the knife; and at that point, he
> discharged his weapon to alleviate the threat.

> That is clearly a position that has been taken based upon his
> perception, understanding, and comprehension of the facts.  We should
> be allowed to cross-examine this man regarding his perception,
> comprehension, and understanding of the facts.  And if in fact that was
> compromised by his use of drugs or anything that would bear a relation
> to that, his sleep disorder, which he testified clearly affected him and
> made him - - rendered him incapable of performing on certain days, the
> drugs that he was taking for his sleep disorder, the illegal drugs that
> were found in his system after the shooting, all of those things would
> bear on an individual's perception, comprehension, understanding of the
> facts.  He has testified about that.

JA 1886. The trial court refused to relent and forced the plaintiff to conduct a cross-

examination of the officer who shot plaintiff's decedent to death, with both hands tied

behind his back.  The credibility of an individual taking the witness stand in a trial,

be it criminal or civil, is a proper subject of cross-examination.  F.R.E. 611.

The trial court abused its discretion when it refused to allow any cross-

examination of Mr. Eagan regarding his ability to assess, comprehend and recall

-43-

events in light of his admitted use of mind altering prescription drugs.  The trial court

abused its discretion when it refused to allow any cross-examination of Mr. Eagan

regarding his use of illegal drugs in light of tests that showed that he had

methamphetamine in his system four (4) days after the shooting in a concentration

suggesting ingestion on the day of the shooting.  The trial court abused its discretion

when it refused to allow any cross-examination regarding Mr. Eagan being declared

unfit for duty and his reinstatement without undergoing the required fitness for duty

examination at the police and fire clinic.  The trial court abused its discretion in

refusing to allow any cross-examination of Mr. Eagan regarding his health issues

which he admitted affected his ability to work from time to time.  JA 56- x 4-15.

### E.    The Trial Court Had No Basis Whatsoever To Grant Summary Judgment To Defendant Eagan With Regard To Plaintiff's Claim For Assault And Battery

In the District of Columbia

A police officer has a qualified privilege to use reasonable force to
effect an arrest, provided that the means employed are not in excess of
those which the actor reasonably believes to be necessary. Moreover,
any person, including an officer, "is justified in using reasonable force
to repel an actual assault, or if he  reasonably believes he is in danger of
bodily harm.  Use of "deadly force," however, is lawful only if the user
actually and reasonably believes, at the time such force is used, that he
or she (or a third person) is in imminent peril of death or serious bodily
harm. [citations omitted]

*Etheredge v. District of Columbia*, 635 A.2d 908,916 (D.C.1993).  As noted above,

-44-

there are no undisputed facts indicating that Tremayne Flythe had a knife, and it is not even arguable that a police officer has a right to shoot someone because he/she might be armed, under District of Columbia law. Quite to the contrary

> an officer is subject to criminal liability for using "unnecessary and wanton severity in arresting or imprisoning any person." D.C. Code § 4-716 (1988). The public policy behind [this] statute is to promote the safety of citizens by deterring police use of excessive force.

*District of Columbia v. Peters,* 527 A.2d 1269, 1274 (D.C. 1987). Whether defendant Eagan acted reasonably when he chased an unarmed Tremayne Flythe while shooting at him and then shooting him dead when he turned around is not something that should have decided by the trial court rather, it was for the jury to decide.

Moreover, the trial court's determination that Mr. Eagan acted in an objectively reasonable fashion because "any reasonable officer would have responded to the radio run call transmission of 'drop the knife' and 'tried to stab me'[6] with deadly force," JA 1292, is not in any way consistent with current law. There is no precedent for the notion that a police officer is justified in using deadly force against an individual who he hears was armed at one point in time, but does not threaten the officer or others, resist arrest or attempt to flee. In the trial court's view, a police officer would be justified in shooting an individual who had discarded a knife that he

---

[6] At no place in the record does Mr. Eagan indicate that he heard anyone say "tried to stab me."

-45-

previously had, if he had used it to threaten another, if he came upon that person. What the trial court suggested was not only inconsistent with applicable law, it is conduct that would subject a police officer to criminal prosecution in the District of Columbia. Indeed, the trial court's position was even at odds with the position of the defendants' police practices expert, Charles Key:

> I'm saying that if he is not advancing on him, he's not threatening, just the fact that the man - - the officer might reasonably believe or have probable cause to believe there was a violent felony, just because of that, he doesn't have the right to shoot unless that threat is present at that point or the guy is trying to escape.

JA 2179. The trial court simply did not follow the law when it granted summary judgment in favor of Mr. Eagan with respect to plaintiff's claim for assault and battery.

### F.    The Trial Court Improperly Instructed The Jury With Respect To Plaintiff's Claims Under 42 U.S.C. § 1983

Pursuant to Fed. R. Civ. P. 51, the plaintiff submitted proposed jury instructions regarding her federal claim. All of the instructions proposed by the plaintiff were verbatim from *Model Federal Jury Instructions*, Sand, Siffert, Reiss, Batterman. JA 1271-1280. Instead of giving any of the standard instructions proposed by the plaintiff which explain the statute, plainly set forth the elements that provide a basis for recovery, and which explain how to assess the claim under the

-46-

statute, the trial court provided the jury, over the vigorous objections of the plaintiff,

JA 2038-48, a hodge podge of case law excerpts which were far more confusing and

which gave the jury no guidance whatsoever. After deliberating in this case, the jury

reached a verdict wherein they found defendant Vazquez liable for assault, not liable

under § 1983 and awarded the plaintiff no damages.

　　　The plaintiff submits that the reason for the strange verdict was the incredibly

uninformative jury instructions provided by the trial court and the trial court's failure

to give plaintiff's proposed jury instructions. This Court has informed that:

> We review the district court's evidentiary rulings for abuse of discretion,
> and we apply the same standard to its articulation of jury instructions .
> . . That said, we will reverse an erroneous evidentiary ruling or jury
> instruction only if the error affects a party's substantial rights. [citations
> omitted].

*Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013). In this case,

the trial court's jury instruction on what constitutes a seizure was confusing, and

contrary to law. *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). The

fact that a seizure occurred was not an issue, it is undisputed that Tremayne Flythe

was directed by defendant Vazquez to tie his dog to a fence, and come speak with

defendant Vazquez, which he did, and defendant Vazquez then took him by the arm

to lead him to the back of his vehicle. That clearly constitutes a seizure.

　　　We can see no basis for classifying Brodie's action—putting his hands

-47-

> on the car when told to do so by the police—as anything other than full
> compliance with the officer's request . . . Contrary to the government's
> position, the short duration of Brodie's submission means only that the
> seizure was brief, not that no seizure occurred.

*Id*.  The trial court, in instructing the jury as it did, made the jury's task far more
difficult than it had to be.  By failing to properly instruct the jury on the purpose of
the statute, that the only issue before them was whether or not unreasonable force had
been used and by suggesting to them that there could be a finding that a "seizure" had
not occurred in this case, the trial court adversely affected the rights of the plaintiff
with respect to her violation of civil rights claim under 42 U.S.C. § 1983.

### G.    The Plaintiff Is Entitled To A New Trial On The Issue Of Damages With Respect To Defendant Vazquez

As noted earlier, after a jury trial, the jury found that defendant Vazquez was
liable with respect to plaintiff's claim for assault, however, it failed to award the
plaintiff any award of damages.

> The primary purpose of tort law is to compensate plaintiffs for injuries
> they have sustained due to the wrongful conduct of others.  The normal
> measure of tort damages is the amount which compensates the plaintiff
> for all of the damages proximately caused by the defendant's negligence.

*Haymon v. Wilkerson*, 535 A.2d 880, 885 (D.C. 1987).  This Court has held:

> Although the question of damages is within the province of the jury, a
> jury verdict should be set aside when it is so inadequate as to indicate
> prejudice, passion or partiality on the part of the jury, or where it must
> have been based on oversight, mistake or consideration of an improper

-48-

element.

*Lester v. Dunn*, 475 F.2d 983, 986 (D.C. Cir. 1973). In this case the jury's verdict was clearly based on oversight, mistake or an improper element inasmuch as they awarded the plaintiff $187,000 in damages for assault and battery against the District of Columbia based upon the actions of Vazquez and Eagan. Furthermore, the evidence in this case, which must have been accepted by the jury, was that defendant Vazquez was shooting at Tremayne Flythe, who was unarmed at close range. Tremayne Flythe was in fear for or his life as he fled with defendant Vazquez giving chase while shooting at him as he ran. The jury award of $0 is irreconcilable with the finding of liability for an assault whereby plaintiff's decedent was being shot at and being chased by a police officer who appeared to be trying to kill him. It is inconceivable that not even an award of nominal damages for mental anguish and /or mental distress was awarded by the jury. Thus, it is apparent that the jury was guided by oversight, mistake or an improper element.

Accordingly, this Court should not only reverse the rulings granting summary judgment in favor of the District of Columbia and defendant Eagan, it should also order a new trial on damages with respect to the jury's finding of liability on plaintiff's claim of assault against defendant Vazquez.

**H.     The Trial Court's Ruling Granting A Set-Off To The District Of Columbia In The Absence Of Any Evidence Of Any Kind Indicating That Any Portion Of The Damages Award Represented Compensation For Care And Treatment That It Provided Or Paid For Was Erroneous As A Matter Of Law**

Inexplicably, the District of Columbia claimed that it had a "medical lien" in the amount of $68,046.76 and was entitled to a set-off against the judgment in that amount.  However, the fact of the matter is that no legally recognized lien has ever existed.  D.C. Code §4-602 provides as follows:

(a) Whenever the District provides health-care assistance to a beneficiary who has suffered an injury or illness under circumstances creating liability in a third party or under circumstances that would have created such a liability had the beneficiary instead of the District incurred the expense of the health-care assistance, it shall have an independent, direct cause of action against that third party for the unreimbursed value or cost of the health-care assistance provided.

(b) As soon as the District begins providing health-care assistance to a beneficiary, it shall become subrogated to any right or claim that the beneficiary has against a third party for the care and treatment it has undertaken to provide or pay for as health-care assistance. Alternatively, or in addition to the legal subrogation effected under this subsection, the Mayor may require a beneficiary to execute a written assignment of that same right or claim.

§4-602 is inapplicable to the situation here, and does not provide a basis for a lien against the plaintiff, as the plaintiff is not a third-party tortfeasor who caused an injury to the alleged beneficiary, Tremayne Flythe.

D.C. Code §4-606 is also inapplicable as it pertains to the notice requirements

in the event an individual or institution that provides health care services that are to be billed to the District becomes aware of a third-party that may be responsible for causing the need for the health care assistance, and/or requires that a beneficiary provide notice to the District of any legal proceeding against or settlement negotiations with a liable third party.

D.C. Code §4-607 provides in relevant part as follows:

Except as limited by subsections (b) and © of this section, the District shall have a lien, perfected in accordance with subsection (d) of this section, **upon any judgment or settlement awarded or executed in favor of a beneficiary against a third party for that amount of the judgment or settlement that represents the care and treatment it has undertaken to provide or pay for as health-care assistance.**

Because there was no third-party involved in this case, and the only judgment was against the District of Columbia, this D.C. Code provision is inapplicable as well. Thus, no legally tenable medical lien existed, as a matter of law.

D.C. Code § 4-603 provides, in relevant part:

(a) Except as provided in subsection (b) of this section, whenever the District is a defendant in a proceeding brought by a beneficiary, it shall have a right to set off from a judgment against it any damages that represent compensation for the care and treatment it has undertaken to provide or pay for as health-care assistance.

A "party claiming a set-off bears the burden of establishing it." *District of Columbia v. United Jewish Appeal Fed'n*, 672 A.2d 1075, 1080-81 (D.C. 1996).

> As the party seeking a setoff, the District bears the burden of showing that the amount sought to be deducted is in fact part of the verdicts.

*District of Columbia v. Jackson*, 451 A.2d 867, 873 (D.C. 1982).  Here, as in *Jackson*, it was impossible to determine what amount, if any, the jury awarded to the plaintiff in medical expenses.  Under such circumstances:

> It is impossible to know how much in medical expenses was awarded and how it was allocated among the three general verdicts -- one for the survival action and two for wrongful death. The District, therefore, has failed to show that the full sum for which it claims a credit was included in the jury's verdicts . . . We cannot order a setoff without knowing what findings formed the basis of the damage award. [citations omitted].

*Id*. at 874.  Consequently, the only way that the trial court could have determine if, and in what amount, the District was entitled to a set-off was following a new trial on the issue of damages.  *Jackson, supra*., at 874-75. (Accordingly, we reverse the judgment and remand the case for a new trial on the issue of damages).[7]

Further, a set-off is a compulsory counter-claim.  "Further, a claim for set-off is a compulsory counterclaim, Super. Ct. Civ. R. 13 (a); *District of Columbia v. Morris*, 367 A.2d 571, 573 (D.C. 1976)," *United Jewish Appeal Fed'n, supra.*, and is barred if not pled in response to plaintiff's complaint.  *Id*.

---

[7] A new trial with respect to damages is clearly warranted in this case if for no other reason that the jury's failure to award damages against defendant Vazquez even though it found that he committed an assault against Tremayne Flythe.  Based upon their finding of liability, damages were not optional, they were required, as the court so instructed.

-52-

In sum, the District's mere proclamation that it was entitled to a set-off of $68,046.76, simply because a District of Columbia employee drafted a letter informing of an alleged claim of a lien against some non-existent third-party tortfeasor, did not even come close to establishing its entitlement to such a set-off as is required under applicable case law. *Jackson, supra*. Plainly stated, the District did not demonstrate that the verdict rendered by the jury included any medical bills at all; did not demonstrate what medical bills, if any, it paid or medical services it provided and the cost thereof; and more importantly, it was not explained how it could be entitled to a set-off, despite the fact that it did not file a counter-claim, that was compulsory as a matter of law, alleging its right thereto.

The trial court granted a set-off without any legal basis to do so. If it is believed that the District is entitled to a set-off, despite its failure to file a counter-claim, a new trial on the issue of damages must be convened.

## VII.  <u>CONCLUSION</u>

The ruling of the trial court regarding summary judgment in favor of the District of Columbia with respect to plaintiff's claim for negligent supervision and should be summarily reversed and this matter should be remanded to the trial court on this issue.

The ruling of the trial court regarding summary judgment in favor of Travis

-53-

Eagan with respect to plaintiff's §1983 excessive force/unlawful seizure claim should be summarily reversed and this matter should be remanded to the trial court on this issue.

The court improperly granted the motions in limine filed by the defendants. Those orders have no support under the law and should be reversed. Following a reversal, this Court should remand this matter to the trial court with instructions to treat those motions as denied.

This Court should set aside the trial court's award of a set-off in favor of the District of Columbia and direct that if it determines that the District is entitled to a set-off, the trial court shall convene a new trial on the issue of damages and require appropriate proof of the amount allegedly subject to be set-off.

The Court should direct the trial court to convene a new trial with respect to damages as to plaintiff's assault claim against defendant Vazquez.

Respectfully submitted,

 /s/ Gregory L. Lattimer
Gregory L. Lattimer [371926]
1200 G Street, N.W.
Suite 800
Washington, D.C.  20005
Tel. (202) 638-0095

Ernest W. McIntosh
Newman & Mcintosh, LLC
1331 H Street, N.W.
Suite 902
Washington, DC 20005
(202) 638-1331

Counsel for the Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing brief and Joint Appendix were

served electronically through the Court's CM/ECF system this 7th day of October,

2014, upon:

Carl Schifferle, Esq.
Office of the Attorney General
Office of the Solicitor General
441 4th Street, N.W.
6th Floor, South
Washington, D.C. 20001

Robert E. Deso, Jr.
Deso & Buckley, PC
1828 L Street, N.W.
Suite 270
Washington, D.C. 20036

                                        /s/ Gregory L. Lattimer
                                   Gregory L. Lattimer


## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO<br>F.R.A.P. 32(a)(7)( c) AND CIRCUIT RULE 32(a)(2)</u>

I certify that pursuant to F.R.App.P. 32(a)(7)( c) and District of Columbia

Circuit Rule 32(a)(2), the attached principal brief is proportionally spaced, has a

typeface of 14 points and contains 13,720 words.


10/7/2014                              /s/ Gregory L. Lattimer
Date                             Gregory L. Lattimer, Esq.